**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **CHARLIE ALLEN ABSHER, SR.** | ) | **CASE NO. 10-70636** |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **SHARON E. RUSS and** | ) | |
| **MICHAEL B. RUSS** | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | **Adversary Proceeding No. 10-07039** |
| v. | ) | |
| | ) | |
| **CHARLES, a/k/a "CHARLIE",** | ) | |
| **ABSHER, d/b/a ABSHER SALES** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION

This adversary proceeding concerns the effort by the Plaintiffs, Michael and

Sharon Russ, who in 2002 purchased a used 1999 model Subaru Legacy Outback from Charlie

Absher, Sr., the Debtor in the underlying bankruptcy case, to obtain a non-dischargeable

judgment against him for the loss which they claimed to have suffered by reason of such car's

undisclosed salvage title history.  Because the parties have consented to the jurisdiction of this

Court to enter a judgment resolving this dispute and the greater weight of the evidence persuades

the Court that the Plaintiffs were induced to purchase the vehicle on the basis of a false

representation of a material fact about the Subaru's damage history made by the Debtor's

salesman, which representation caused them to forego making their own investigation of such

vehicle's history, and that as a result they acquired a vehicle which was worth significantly less

than the contract price for it, the Court will enter judgment in favor of the Plaintiffs.

FINDINGS OF FACT

The Court finds the following to be the relevant facts in this proceeding by the greater weight of the evidence:

1. The Debtor filed the underlying bankruptcy case under Chapter 7 of the Bankruptcy Code in this Court on March 17, 2010.

2. At all times relevant to the claim advanced in this proceeding the Debtor was operating as a sole proprietorship a used car business in Pounding Mill, Virginia under the business name Absher Sales.

3. On or about March 29, 2002[1] the Debtor purchased a used 1999 Subaru Legacy Outback, having a Vehicle Identification Number ("VIN") of 4S3BG6858X7615114, from Francis Motors in Sparta, North Carolina. The title by which the Debtor acquired ownership indicated immediately to the left of the Debtor's signature that the vehicle in question had been involved in a collision "to the extent that the cost of repair exceeds 25% of fair market value" and that it "has been a reconstructed or a salvage vehicle." The Debtor acknowledged in his testimony his awareness of these facts.

4. Mr. and Mrs. Russ purchased this vehicle from Absher Sales on or about July 10, 2002. They bought it to provide reliable transportation for Mrs. Russ in commuting to and from her place of employment and other incidental transportation needs of the Russ household. There

---

[1] The First Re-Assignment of Title by Dealer on the North Carolina Certificate of Title held by Francis Motors contains an acknowledgment date of March 25, 2002, but the Virginia DMV Application for Certificate of Title and Registration completed by Absher Sales lists a purchase date of March 29, 2002.

2

is no indication that it was acquired for any business purpose.  It is undisputed that at such time

they were not aware that the Subaru had been involved in two separate serious accidents after

each of which it had been repaired or that it had a salvage title history although they did know

that some paint work had been done on the vehicle.  At Mr. Absher's express direction his

employee, Jeff Curtis, who served as both salesman and finance manager for the transaction,

obtained the signature of Mr. Russ to a statement that he was aware that some paint work had

been done to the vehicle.  Mr. Absher has not offered any reason for not disclosing the

Outback's accident and salvage title history other than his claim that Virginia law did not require

such a disclosure at the time the transaction with the Plaintiffs took place.  He intentionally did

not disclose such facts to Mr. and Mrs. Russ and did not instruct his salesman, Mr. Curtis, to

disclose such information to them.  According to Plaintiffs' Exhibit # 11, which is an internal

record[2] of the company commonly known as CARFAX®, on June 13, 2002 that company

provided a vehicle history report for the Subaru Outback by email to its subscriber, Absher

Sales.  CARFAX® is a company in the business of providing to its subscribers and the general

public specific motor vehicle history information such as accidents, salvage or flood titles, title

transfers, service  records and similar information.  The Debtor denies any knowledge of this

report or that its file for the subject transaction had any record of it.  Both the Debtor and his

salesman, Mr. Curtis, who testified on the Debtor's behalf, denied having requested such report

or any other knowledge of it prior to the sale of the Outback to Mr. and Mrs. Russ, which

occurred just shy of a month after the exhibit indicates the electronic report had been provided to

---

[2] This record provides a listing of the vehicle report requests received by the company for
the Subaru Outback involved in this proceeding.

3

Absher Sales.

5. The purchase price for the Subaru was $16,495 of which $15,494.16 was financed by a company known as WFS Financial and $1,000.84 of which was provided by a net trade-in allowance, after deduction of the indebtedness owing upon that vehicle of $10,809.16.  The financing provided by WFS Financial was arranged by Mr. Curtis in his capacity as finance manager for the dealership.  At that time the average "clean retail" sales price for a vehicle of the model, year and mileage of the car purchased by the Plaintiffs with a "clean" non-salvage title history, according to a NADA valuation received into evidence without objection, was $16,975.  Such exhibit further indicates values of  $14,625 for "clean trade-in" and $13,225 for loan value.

6.  Mr. Russ did not personally attend the trial but his testimony came into evidence pursuant to Federal Rule of Civil Procedure 32(a)(4)(C), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7032, in the form of a discovery deposition which he gave in state court litigation brought by Mr. and Mrs. Russ against Mr. Absher concerning this same transaction.  Accordingly, this Court did not have the benefit of hearing his account firsthand and observing his demeanor while testifying, which has presented something of a challenge in that contradictory testimony was given by the Debtor's former salesman, Jeff Curtis, who did testify at trial.  Nevertheless, after reviewing the deposition testimony very carefully and considering the supportive testimony of Mrs. Russ, who did testify at trial, as well as having had the benefit of observing the demeanor of Mr. Curtis at trial, the Court believes that the following testimony of Mr. Russ represents the more accurate account of what transpired between him and Mr. Curtis on that long ago day:

> I said "I smell paint," you know, and stuff like that.  I was looking at
> it, because I've been around bodywork before, and it had kind of an

4

orange peel shaping on the fender, and stuff like that. Mr. Curtis said "Well, Mike, I'll tell you. I'll be straight up with you. The car has been in a fender-bender. It was the fender and the door, passenger side." . . . "It was the fender and door on the passenger side that" -- like where they connect and open up, that was damaged. He said "A lady from Tennessee had got hit and the car was damaged and she had traded it in." . . . I got up and I says "Well, I guess I'm probably just going to have to get a Carfax in." He says "Well, like I mentioned, Mike, we try to be straight up. We're good Christian people," and stuff like that. "What I know of the vehicle, this is all I know that's wrong with it."

. . .

Q. At that time I assume you knew what a Carfax was?

A. Yes, sir.

Q. Had you gotten a Carfax before in the purchase of a vehicle?

A. Well, I was told once before to get a Carfax, and I didn't. And this is the reason why I asked this time.

Q. So you knew what a Carfax was?

A. Yes.

Q. What was your understanding that a Carfax might show?

A. Might show the damage, if there was damage to a vehicle, or if it was a possible severely damaged vehicle, which we have been talking, you know, or whether it was worth the value or if it was even worth being on the lot. To me, that's what a Carfax is.

Q. So you knew what a Carfax was and you had an understanding what information a Carfax would provide. And you told Jeff Curtis that you guessed you'd have to get a Carfax?

A. Probably "I need a Carfax."

Q. Did you get a Carfax?

A. Jeff said, he goes "Mike," when I mentioned it, he says "I've been straight up there. What I've told you about the car is all I know. It's a good car. It's got low mileage. It runs good." He goes "I really don't think you need a Carfax, to tell you the truth."

. . .

Q. Well, Mr. Russ, you knew that you could independently get a Carfax, didn't you?

A. Yes. I asked for one.

Q. Well, you knew you could get one, on your own, didn't you?

A. Yes.

Q. Carfax, anybody can get a Carfax, can't they? You knew that?

A. Yes.

Q. You made the decision not to get a Carfax, because he says "I'm being straight up with you"?

A. No, not from him. I was consumed(sic.) after I drove the car, the

car was pretty nice, and stuff  like that, that Mr. Curtis was being
honest.

Deposition of Michael Russ dated February 5, 2008, p. 16, line 25 thru p. 17, line 13; p. 17, line

23 thru p. 18, line 3; p. 18, line 19 thru p. 19, line 22; p. 20, lines 9 thru 22.  According to

Plaintiffs' Exhibit # 12, which is a CARFAX® report issued on January 7, 2005 for the Subaru,

the vehicle had been involved in two accidents which had resulted in the issuance of separate

salvage titles or certificates for it.  The more recent accident occurred on July 13, 2001 in Wilkes

County, N. C. and according to a police report involved a right rear impact which resulted in the

vehicle overturning and incurring "severe damage."  If Mr. Curtis did not know at the time that

his representation that the Subaru had only been involved in a "fender bender" was false or

seriously misleading, he made it with reckless disregard of whether such statement was accurate

and with the intent to persuade Mr. Russ that the car was in good condition, that it had not been

compromised or seriously damaged, and that there was no other relevant information about the

vehicle's history that a CARFAX® report would disclose.  Mr. Curtis had reason to deflect Mr.

Russ from further inquiry about the history of the vehicle as he was compensated on the basis of

vehicles which were both sold and financed, meaning that a transaction successfully closed.[3]

7.  Mr. Russ was given the opportunity to test drive the vehicle before buying it and in

fact did so.  He was aware that he could have obtained on his own a CARFAX® title history of

the vehicle but did not do so as a result of his satisfaction with his test drive of the car and the

assurance given him about the nature of the accident which had precipitated the paint work on

---

[3]  According to the testimony of Mr. Absher at trial it was his policy to provide a
CARFAX® report if one were requested.  Trial Transcript p. 31.  According to Exhibit #11,
Absher Sales was a CARFAX® service subscriber prior to the Plaintiffs' purchase of the Subaru.

the car of which he was aware.  Both factors were material to the Russes' decision to purchase

the Outback.  The purchase contract for the Outback signed by the Plaintiffs provided on its

reverse side a number of printed "Additional Conditions of Sale," including one stating that the

vehicle was sold "without warranty, express or implied, including any implied warranty of

merchantability or fitness for a particular purpose" in all capital letters.  (Plaintiffs' Exhibit #1, ¶

6).

8.  Mr. and Mrs. Russ drove the car approximately 20,000 miles before they lost

confidence in it and decided that they wanted to trade it for another vehicle at another dealership

at which a relative of Mrs. Russ was employed.  When they attempted to complete the

transaction, however, that dealership obtained on or about February 22, 2004 a CARFAX®

report[4] which disclosed that the Subaru had been involved in two separate major accidents with

two resulting salvage titles in its title history.  That dealership was unwilling to accept a trade of

the vehicle on any terms.  This was the first time that the Plaintiffs were aware of these matters

in their car's title history.  They would not have purchased the vehicle from Absher Sales if they

had known that the Subaru had one salvage title in its history, much less two, or that it had been

involved in a serious accident.

9.  There is no proof before the Court as to whether the problems which the Plaintiffs had

with the vehicle in question were the result of the previous damage which such vehicle had

incurred or were unrelated to its previous accidents.

10.  After the Plaintiffs learned of the prior accident history of the Outback, they made no

effort to have it repaired or even to have any evaluation made by a mechanic as to what repairs it

---

[4] Plaintiffs' Exhibit # 4.

needed and the estimated cost of such repairs.  They ceased using it and stopped making

payments on the loan which had funded its purchase.  The latter course of action resulted

eventually in the finance company's repossession and sale of the vehicle.  As a consequence, a

deficiency judgment in favor of WFS Financial, Inc. against the Russes was entered in the

Circuit Court of Tazewell County, Virginia on October 11, 2006 in the amount of $9,201.98 plus

court costs of $49.00.  Prior to such repossession and sale occurring, there is no indication in the

evidence that the Plaintiffs made any explicit demand upon the Debtor to accept return of the

vehicle, rescind the transaction and refund all or some negotiated portion of the purchase price.

　　11.  The only evidence offered at trial as to the difference in value between a vehicle with

a "clean" history and one which had a salvage title in its history was that of the Plaintiffs' expert,

Tony Frederic, who stated that he had been involved in the automobile business in this area for

twenty four years.  He testified that there was a market for vehicles with a disclosed salvage title

from buyers looking for a bargain and that in his experience the general rule of thumb was that a

50% discount from the price of the same vehicle with a "clean" title history was indicated.

When asked by the Court about a vehicle having two salvage titles in its history, he supposed

that a second 50% discount would be called for but admitted that he had no actual experience

with such a vehicle in the market place.  The Court will credit his testimony of a 50% discount

for one salvage title, but not his application of that same factor for a second salvage title, which

would end up with a 75% total discount for a fully repaired vehicle.  Of course it stands to reason

that a vehicle with two salvage titles in its history would incur a greater reduction in value than a

car having only one of them, but the Court finds that a 60% discount is likely to be much closer

to the mark than is a 75% factor.  Based on the NADA valuation of $16,975 for an average clean

retail value for an Outback of the same year, mileage and equipment as the one purchased by the

Plaintiffs, the actual value would then equate to 40% of $16,975 or $6,790.  Subtracting that

amount from the actual sale price of $16,495 yields a difference of $9,705, which the Court finds

to be the actual damage suffered by the Russes as a result of the transaction.  The Court further

finds that they incurred this damage at the time of purchasing the vehicle from the Debtor.

12.  The Debtor's underlying bankruptcy case has been treated as a "no asset" case and

the Chapter 7 trustee has filed a final report to such effect.  The Plaintiffs have not filed a proof

of claim against the bankruptcy estate and have had no reason to do so as no bankruptcy estate

sufficient to permit any distribution to creditors has been determined to exist.

13.  Before proceeding with the trial of this proceeding and after discussion of the

implications of the Supreme Court's recent decision in the case of *Stern v. Marshall*, __ U.S.__,

131 S.Ct. 2594 (June 23, 2011), counsel for the Plaintiffs and counsel for the Debtor stipulated

on the record the consent of their respective clients to the Court's jurisdiction over this

proceeding and its entry of judgment in it.  This consent was reiterated at an unscheduled

conference concerning this very point involving the Court, Mr. Copeland (counsel for the

Debtor) and Mr. Lamie (counsel for the Plaintiffs) in open court in Abingdon during the morning

of October 5, 2011 during which both attorneys advised that the long process of litigation had

exhausted their clients and they very much wanted to obtain a resolution of their dispute.

14.  Among the exhibits offered by the Plaintiffs was one (# 15) setting forth an itemized

account of the legal services rendered by their primary counsel first in state court and later in

bankruptcy court in the prosecution of their claims against the Debtor.  The Court stated at that

time that it would defer receiving evidence on the Plaintiffs' claim for reasonable attorneys' fees

and costs pursuant to the Virginia Consumer Protection Act or affording the Debtor an

opportunity to challenge any amount so claimed until after it ruled on the general merits of the

basic claim, because determination of attorneys' fees would be pertinent only if the Court

concluded that a valid non-dischargeable claim under such Act had been presented.  The Court

finds that the Plaintiffs' attorneys have rendered substantial legal services to them in the

presentation of their claim against the Debtor, but that the sum total of all the services required to

establish the Debtor's liability to them cannot be determined until either the Debtor has accepted

the finality of a judgment rendered against him or all appeals or other legal challenges to the

validity of the judgment have been exhausted or otherwise conclusively resolved.

15.  To the extent that the following section of this decision contains any factual

determinations not set forth above, particularly in that section examining the title history of the

vehicle sold by the Debtor to the Plaintiffs, the Court hereby adopts all such factual

determinations as findings of fact.

CONCLUSIONS OF LAW

This Court has statutory authority to exercise jurisdiction over this adversary

proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court

by Order from the District Court on July 24, 1984.  It is clear that a proceeding seeking a

determination that a particular claim against a bankruptcy debtor is non-dischargeable under §

523 of the Bankruptcy Code is a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(I).

Such a proceeding is one which undoubtedly arises under title 11 of the United States Code and

upon which this Court is clearly empowered, statutorily and constitutionally, to render a final

judgment under the rationale of the Supreme Court's recent decision in the case of *Stern v.*

10

*Marshall*, 131 S.Ct. at 2604-05, because it involves a determination of rights under the federal

Bankruptcy Code, specifically, the scope of a bankruptcy discharge, rather than a claim under

common law.  The point which is troublesome, however, under the rationale of *Stern,* is whether

this Court may enter a final judgment on not just the issue of what claims are non-dischargeable

under the Bankruptcy Code, but also on the basic question of liability of the Debtor to the

creditor under non-bankruptcy law and determine the damages which ought to be awarded if a

case of liability is found.  The latter of those determinations (*i.e*., determination of legal liability

and damages) would appear to be ones which call into question the exercise of "judicial power"

by a non-Article III judge.  Although the United States Court of Appeals for the Fourth Circuit

stated in a 2001 decision that a bankruptcy court does have jurisdiction to enter a monetary

judgment in favor of a creditor as a part of a proceeding to determine that the debt is non-

dischargeable when a state court has not already liquidated the claim and entered a judgment, of

course that was a pre-*Stern* ruling.  *In re Heckert*, 272 F.3d 253, 257 (4th Cir. 2001).[5]


IMPLICATIONS OF *STERN  v.  MARSHALL* DECISION

The Court and counsel for the parties have been jointly concerned about whether

the consent of the parties is sufficient for this Court to enter a final judgment of non-

dischargeable liability and damages against the Debtor, if warranted by the evidence and

controlling law, even if constitutional authority may be lacking.  The Court's initial leaning in

---

[5] Judge Schmetterer of the Bankruptcy Court for the Northern District of Illinois posed
this same issue with respect to the continued viability of pre-*Stern* precedent in the Seventh
Circuit in *Dragisic v. Boricich (In re Boricich)*, 2011 WL 2600692 at *9 (Bankr. N.D.Ill. June
29, 2011).

this matter was that if it concluded that non-dischargeable claims against the Debtor were

presented, that it should submit proposed findings of fact and conclusions of law to the District

Court for its consideration and entry of a final judgment in favor of the Plaintiffs as it might

determine appropriate.  *See* Court's letter to counsel dated August 12, 2011, docket # 70.  Such

an approach has been approved by counsel for both parties.  *See* letters from counsel at docket #

69, 71 and 72.  On the other hand, the Supreme Court in *Stern* did not permit Mr. Marshall to

withdraw his consent to the bankruptcy court's determination of the claim he filed against the

bankruptcy estate even though such determination involved an adjudication of liability under

state tort law.  *Stern*, 131 S.Ct. at 2608.  In the case before this Court, the Plaintiffs have not filed

any claim against the bankruptcy estate, but counsel for both parties have twice stated on the

record at trial their clients' consent to this Court's entry of a final judgment adjudicating the

Debtor's legal liability, if any, to Mr. and Mrs. Russ as well as its dischargeability.  *See* Trial

Transcript at pp. 8-10.  For this Court to rule that such consent was not effective would call into

question the continued viability of other statutory provisions permitting the exercise of "judicial

power" by non-Article III judges with the consent of the parties in other contexts.  *See* 28 U.S.C.

§ 636(c) (providing for trial of civil cases by Magistrate Judges pursuant to consent of parties), §

157(c)(2) (providing for trial by Bankruptcy Judges of "related to" jurisdiction matters with

consent of parties and authorization of the District Court), and § 157(e) (providing for trial of

jury cases by Bankruptcy Judges with consent of parties if specially designated by District Court

to exercise such jurisdiction).  *See also* Federal Rules of Bankruptcy Procedure 7008(a) and

7012(b) providing for entry of final orders in non-core matters by bankruptcy court with consent

of parties.  Because this Court is unaware of any post-*Stern* decision by any appellate court

denying validity to any such judgment in a proceeding determined by a non-Article III judge

acting pursuant to the consent of the parties,[6] it concludes that it is empowered to enter such a

judgment in this proceeding.  If its conclusion is later determined to be in error, the appeal from

its judgment will be to the same District Court to which this Court would have submitted

proposed findings of fact and conclusions of law for the District Court's entry of a final

judgment and any error may be appropriately corrected in that Court.


### EXAMINATION OF LAW REGARDING SALE OF SALVAGE VEHICLES

The unusual facts pertinent to the vehicle in question, namely the issuance of

multiple titles in both Virginia and North Carolina, the issuance of two different "salvage" titles

upon the same vehicle due to two separate accidents, the purchase of the vehicle in North

Carolina by a Virginia dealer, the issuance of a "clean" title by Virginia to the Debtor before he

sold it to the Russes in a sale which took place in Virginia, and the differing laws of the two

states regarding how much damage must occur before a vehicle is deemed to be one which

requires the issuance of a "salvage" title, present some challenging issues of legal analysis.

---

[6] For that matter the Court is unaware of any post-*Stern* appellate rulings on point either way.  Such other authority and commentary that are available at this time seem mostly to support the approach being taken by this Court.  *See Meoli v. The Huntington Nat'l Bank (In re Teleservices Group, Inc.)*, __ B.R. __, __, 2011 WL 3610050 at * 14 (Bankr. W.D.Mich. Aug. 17, 2011) (Hughes, B.J.); *In re Safety Harbor Resort and Spa*, ___ B.R. ___, ___, 2011 WL 3849639 at **11-12 (Bankr. M.D. Fla. Aug. 30, 2011) (Williamson, B.J.); *In re Bearingpoint, Inc.*, 453 B.R. 486, 492 (Bankr. S.D. N.Y. 2011) ("assuming that after *Stern v. Marshall*, consent would still be effective") (Gerber, J.); J. Azoff and T. Szaniawski, *Stern v. Marshall and the Limits of Consent,* Vol. XXX, Am. Bankr. Inst. J. No. 7, 28 (September 2011 issue).  *But see Samson v. Blixseth (In re Blixseth)*, 2011 WL 3274042 at *12 (Bankr. D. Mont. Aug. 1, 2011) ("[N]o [Bankruptcy Code] provision allows parties to consent to a bankruptcy court making final decisions in core proceedings ....").

Virginia law defines a "salvage vehicle" as a vehicle which has experienced one or more types of events in its history, including among others "any late model vehicle[7] which has been . . . acquired by an insurance company as a part of the claims process other than [for] a stolen vehicle" or "any other vehicle which is determined to be a salvage vehicle by its owner or an insurance company by applying for a salvage certificate for the vehicle, provided that such vehicle is not a nonrepairable vehicle."  Va. Code § 46.2-1600.  It also defines a "rebuilt vehicle" as "any salvage vehicle that has been damaged . . . and has been repaired and the estimated cost of repair exceeded 75 percent of its actual cash value, for use on the public highways" or "any late model vehicle which has been repaired and the estimated cost of repair exceeded 75 percent of its actual cash value, excluding the cost to repair damage to the engine, transmission, or drive axle assembly."   As relevant to the facts of this proceeding, § 46.2-1602(A)(4) of the Virginia Code declares that it "shall be unlawful . . . [f]or any person to sell a rebuilt vehicle without first having disclosed the fact that the vehicle is a rebuilt vehicle to the buyer in writing on a form prescribed by the Commissioner."  Although a violation of this statute carries a criminal penalty,[8] the statute by its terms does not make knowledge on the part of the seller an element of the offense.  Any salvage vehicle which is repaired, inspected by the Department of Motor Vehicles and found to be satisfactory may be issued a new title but "[t]he title issued by the Department and any subsequent title thereafter issued for the repaired or rebuilt vehicle shall be

---

[7] "'Late model vehicle' means the current-year model of a vehicle and the five preceding model years, or any vehicle whose actual cash value is determined to have been at least $10,000 prior to being damaged."  Va. Code § 46.2-1600.  Under this definition the Subaru at issue in this proceeding, a 1999 model for which Virginia issued a "salvage title" in 2000 and was later purchased by Mr. and Mrs. Russ in 2002, would qualify as a "late model vehicle."

[8] Va. Code § 46.2-1609.

14

permanently branded to indicate that it is a repaired[9] or rebuilt vehicle."  Va. Code § 46.2-1605.

According to Plaintiffs' Exhibit # 6, on June 12, 2000 the Virginia Department of Motor

Vehicles ("DMV") issued a salvage title for the vehicle to Nationwide Assurance.

Approximately four months later the DMV issued a new title for the vehicle, apparently not so

designated.  Plaintiffs' Exhibit # 4 (CARFAX® Vehicle History Report issued Feb. 22, 2004).

According to that same exhibit, after the Debtor's purchase of the Subaru from Francis Motors in

March of 2002, the DMV issued a new title, presumably to Absher, apparently containing no

salvage designation.

When the Debtor purchased the vehicle from Francis Motors, the North Carolina

"re-assignment of title" from the latter to the former noted both that the Subaru had been

involved in a collision "to the extent that the cost of repair exceeds 25% of fair market value"

and that it "has been a reconstructed or a salvage vehicle."  These disclosures on the re-

assignment of title appear to correspond with North Carolina's vehicle disclosure requirements.

North Carolina law defines a reconstructed vehicle as one which "has been materially altered

from original construction due to removal, addition or substitution of new or used essential

parts."  N.C. Gen. Stat. § 20-4.01(33)(c).  The same section defines a salvage motor vehicle as

"any motor vehicle damaged by collision or other occurrence to the extent that the cost of repairs

. . . would exceed seventy-five percent (75%) of its fair retail market value."  N.C. Gen Stat. §

20-401(33)(d).  With these definitions in mind, North Carolina law provides as follows with

respect to the sale of either type of vehicle:  "It shall be unlawful for any transferor of a motor

---

[9] A "'repaired vehicle' means any salvage vehicle that has had repairs less than the
amount necessary to make it a rebuilt vehicle."  Va. Code § 46.2-1600.

vehicle to . . . [t]ransfer a motor vehicle when the transferor has knowledge that the vehicle is, or

was, a flood vehicle, a reconstructed vehicle, or a salvage motor vehicle, without disclosing that

fact in writing to the transferee prior to the transfer of the vehicle." N.C. Gen Stat. § 20-

71.4(a)(2). The disclosure requirement in North Carolina for salvage vehicles, which are

vehicles requiring repairs of more than seventy-five percent of their fair market value, is

essentially identical to the disclosure requirement in Virginia for rebuilt vehicles, which are also

vehicles with repairs exceeding seventy-five percent of their value. However, North Carolina

law also requires disclosure of a reconstructed vehicle's history. As defined by statute, a

reconstructed vehicle in North Carolina is determined not by the cost of alteration as a

percentage of the total value but rather whether it "has been materially altered from original

construction." This standard does not compare as readily with Virginia law, which relies solely

on numerical calculations. To complicate matters further, North Carolina has another disclosure

requirement that also differs with Virginia's laws. *See* N.C. Gen. Stat. § 20-71.4(a)(1). That

statute requires disclosure of the facts surrounding a vehicle's "collision or other occurrence" if

the ensuing repairs exceed only 25% of the vehicle's fair market value.

According to Exhibit #4, the CARFAX® report, the North Carolina Division of

Motor Vehicles issued a Salvage Title/Certificate for the vehicle on September 25, 2001. The

re-assignment of title executed by Francis Motors in favor of Absher notified the latter of two

distinct events, that the vehicle had been damaged such that repairs exceeded 25% of the

vehicle's value and that the vehicle had been either a reconstructed or salvage vehicle. The

implications of these disclosures for Mr. Absher with respect to his subsequent sale of the

vehicle in Virginia are not obvious. Because of the differences within North Carolina law

16

between these three standards, as well the asymmetry between Virginia and North Carolina in this area, the Court has had to consider the available evidence carefully.  It suggests that after each accident in which the Subaru was involved, the vehicle was repaired to restore it insofar as possible to its original condition, not that it was altered in some manner to make it in some way a different vehicle.  Accordingly, under the facts presented here, it appears that under this statutory scheme, as between the alternate classifications of "salvage vehicle" and "reconstructed vehicle" as referenced in the re-assignment of title from Francis Motors to Absher Sales, the Subaru must have been a "salvage vehicle" under North Carolina law rather than a "reconstructed vehicle." This conclusion is supported by the "Salvage Certificate of Title" issued by North Carolina on September 19, 2001 to Allstate Insurance Company and the word "Salvage" stamped on Francis Motor's Title Application by the North Carolina Division of Motor Vehicles.[10]  *See* Plaintiffs' Exhibits 7 & 8.  Because the definition of a salvage vehicle in North Carolina is premised on damage so extensive that the repair cost exceeds 75% of its "fair market value," on first reflection once the vehicle was repaired it would seem that the repaired Subaru would fall within the Virginia statutory definition of a "rebuilt vehicle," which of course would impose an affirmative disclosure obligation under Virginia law.  Counsel for the Debtor, however, argues that a different conclusion is the correct one.

North Carolina law, similarly to that of Virginia, requires permanent "branding" of vehicles having a salvage vehicle history.  N.C. Gen. Stat. § 20-71.3(I).  Nevertheless, its Commissioner of Motor Vehicles issued a title to Francis Motors which does not appear to contain any indication of "branding," which Absher Sales then utilized to obtain a "clean"

---

[10]  This Title Application contains an acknowledgment date of February 25, 2002.

Virginia title as well.  The Debtor argues these events demonstrate that the Subaru was never actually a "salvage" vehicle under the North Carolina definition in that its cost of repair must in actuality must have been less than 75%.[11]  More specifically, there is a process prescribed by statute whereby a damaged vehicle can be "retitled" following a state inspection and an application containing an affidavit averring, among other things, the vehicle's total cost of repair.  *See* N.C. Gen. Stat. § 20-71.3(b)-(e).  In relevant part, the statute states that an "*unbranded title shall be issued only if the cost of repairs . . . does not exceed seventy-five percent (75%) of its fair market value.*"  N.C. Gen. Stat. § 20-71.3(d)-(e) (emphasis added).  The Debtor contends that the clean North Carolina title establishes that this process is precisely what occurred to the vehicle in question.

Of course the transaction which furnishes the basis for this adversary proceeding took place in Virginia.  Accordingly, the Court concludes that its law provides the controlling disclosure regime.  The North Carolina disclosure requirements are more extensive than those contained in Virginia law and therefore might be characterized as providing more protection to automobile purchasers than Virginia has seen fit to mandate.  The North Carolina statutes are relevant, however, in understanding the North Carolina events affecting this vehicle and whether those events create a disclosure obligation with respect to a sale of the vehicle in Virginia.

---

[11] Neither party at trial offered evidence as to the actual cost of repairs made following the North Carolina accident.  Counsel for the Debtor asserts in post-trial argument that the cost of repair resulting from the North Carolina accident was less than 25% of the retail value of the vehicle.  He then contends that this was insufficient to constitute it as a "reconstructed vehicle" under Virginia law (this Court will assume that Counsel intended "rebuilt vehicle"), and thus would not have triggered the disclosure obligation set out by Va. Code § 46.2-1602.  Because no stipulation of, or admission to, the correctness of this factual assertion has been offered, however, it will not be accepted as evidence.

Although Virginia consumers might well assume that Virginia's law requires an automobile

dealer to disclose to a prospective purchaser that a vehicle has a salvage title history, a careful

examination of the statute demonstrates rather that such a disclosure obligation arises only when

the vehicle is a "rebuilt vehicle" under Virginia law, which means, as previously noted, that it is

a "salvage vehicle" which has been so severely damaged that its estimated cost of repair

exceeded 75% of its actual cash value, or that it is a "late model vehicle" where the estimated

cost of repair exceeded 75% of its actual cash value, "excluding the cost to repair damage to the

engine, transmission, or drive axle assembly."  Exhibit # 5 indicates that the cost of needed

repairs following the Virginia accident which resulted in the issuance of the original Virginia

salvage title was less than 75% of the vehicle's actual cash value and therefore it did not become

a "rebuilt vehicle" as a result of that event.  In the absence of satisfactory evidence about the

repairs following the North Carolina accident, the Court concludes that it ought to accord a

presumption of regularity that the North Carolina vehicle titling agency acted in accordance with

applicable law rather than in contravention of it when it ultimately issued a "clean" title to

Francis Motors rather than a "branded" title following its original issuance of a salvage title and

that Virginia's DMV likewise acted properly with respect to the titles it subsequently issued to

Absher Sales and then to the Plaintiffs.  The Court further concludes that the Plaintiffs had the

burden of proof to establish that the vehicle in question was a "rebuilt vehicle" under Virginia

law which would have triggered a specific affirmative disclosure obligation upon Absher in their

favor and that they failed to carry that burden.  In an area of everyday commerce such as the sale

to consumers of used motor vehicles in which Virginia has specifically legislated, it is this

Court's duty to apply the law as it exists, not to move the line in favor of greater disclosure from

19

where the Commonwealth has decided that it ought to be placed.

## ELEMENTS OF § 523(a)(2)(A) OBJECTION TO DISCHARGE

§ 523(a)(2)(A) of the Bankruptcy Code as pertinent to the facts before this Court provides that a Chapter 7 discharge "does not discharge an individual from any debt – for money . . . to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  The language by its terms is not limited to the situation where the bankruptcy debtor personally made the false representation or committed the actual fraud or created the false pretenses, but looks to the question of whether the debtor is liable for a debt which is the product of fraud, false pretenses, or false representations.  Although there is authority that fraud of an agent will be imputed to a debtor-principal only when "the principal either knew or should have known of the agent's fraud,"[12] the clear weight of authority, which follows the interpretation of § 17a(2) of the Bankruptcy Act, is that "the fraudulent intent of the debtor's agent may be imputed to the debtor."  4 *Collier on Bankruptcy* ¶ 523.08[3] at p. 523-24, citing *In re M.M. Winkler & Assocs.*, 239 F.3d 746 (5th Cir. 2001), *In re Cecchini*, 780 F.2d 1440 (9th Cir. 1986), *BankBoston Mortg. Corp. v. Ledford (In re BankBoston Mortg. Corp.)*, 127 B.R. 175, 180-85 (M.D. Tenn. 1991), *aff'd*, 970 F.2d 1556 (6th Cir. 1992), *cert. denied*, 507 U.S. 916 (1993) and other decisions at fn. # 62.  This Court adopts the latter line of authority.

For the exception to be applicable the debtor must have obtained money, property

---

[12] 4 *Collier on Bankruptcy* ¶ 523.08[3] at p. 523-54 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.), citing the 8th Circuit decision of *In re Walker*, 726 F.2d 452 (8th Cir. 1984) and bankruptcy court decisions in Iowa and Ohio.

or services from the objecting creditor.  4 *Collier on Bankruptcy* ¶ 523.08[1][a] at p. 523-43.

While of course an express misrepresentation knowingly and fraudulently made comes within

the exception, reckless misrepresentations may be sufficient as well.  *See Id.* at ¶ 523.08[1][d] at

p. 523-45 citing *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108 (3d Cir. 1995) and

*Phillips v. Coman (In re Phillips)*, 804 F.2d 930 (6th Cir. 1986).  Even a debtor's silence

regarding a material fact "touching upon the essence of the transaction" may in some cases

constitute a false representation within the scope of § 523(a)(2)(A).  *Id.  See Caspers v. Van

Horne (In re Van Horne)*, 823 F.2d 1285 (8th Cir. 1987); *In re Pittman*, 442 B.R. 495 (Bankr.

W.D.Va. 2010) (Krumm, B.J.).

Finally, the creditor asserting a § 523(a)(2)(A) debt must prove that it relied on

the false representation and thereby suffered damage as a result.  In short, the false

representation must have made a material difference in some action which the creditor took or

refrained from taking thereafter.  The creditor need not prove, however, a "reasonable" reliance

on the truth of a false representation, but need only satisfy the lower standard of "justifiable"

reliance.  *Fields v. Mans*, 516 U.S. 59, 71(1995) (party entitled to rely upon false representation

unless its falsity would be apparent from a "cursory glance" or the party has learned something

which ought to serve as a warning that he is being deceived).

The burden of proof upon an objection to the dischargeability of a debt pursuant

to § 523 of the Bankruptcy Code is borne by the creditor and must be established by a

preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279 (1991).  The exception to

discharge is equally applicable to punitive and treble damages as it is to compensatory damages.

Furthermore any award for attorneys' fees awarded as part of the damages for fraud are likewise

excepted from the discharge. *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).


## ELEMENTS OF TORT OF FRAUD UNDER VIRGINIA COMMON LAW

Virginia law on the subject of fraud is very similar, if not virtually identical, to the case law analyzing § 523(a)(2)(A) of the Bankruptcy Code.  For example, under Virginia law it is well recognized that concealment or omission of a material fact may give rise to a claim of actual fraud if there is a duty to disclose.  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999).  *See generally* 8B *Michie's Jurisprudence,* Fraud and Deceit § 15.  Reckless misrepresentations can result in liability for a claim of actual fraud.  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826 (4th Cir. 1999); 8B *Michie's Jurisprudence*, Fraud and Deceit § 19.  Liability for false representation is premised on a statement of fact, not opinion, which is both false and material, which is relied upon by the party deceived, and results in a loss to such party.  *See generally* 8B *Michie's Jurisprudence*, Fraud and Deceit §§ 7, 26-8.  The doctrine of caveat emptor affords no protection to a seller who makes a false representation of a material fact serving as an inducement to enter into a contract on which the buyer had a right to rely. *Boykin v. Hermitage Realty*, 360 S.E.2d 177, 179 (Va. 1987).  The seller must not do anything to divert the purchaser from making inquiries.  *Kuczmanski v. Gill*, 302 S.E.2d 48, 50 (1983); *King Indus., Inc. v. Worlco Data Sys.*, 736 F. Supp. 114, 119 , *aff'd* , 900 F.2d 253 (4th Cir. 1990).  A principal can be held liable for the fraud of its agent.  *Nationwide Ins. Co. v. Patterson*, 331 S.E.2d 490, 493 (Va. 1985); *Jefferson Standard Life Ins. Co. v. Hedrick*, 27 S.E.2d 198, 202 (Va. 1943).

## ELEMENTS OF CLAIM UNDER VIRGINIA CONSUMER PROTECTION ACT

As pertinent to a claim which qualifies for the § 523(a)(2)(A) exception to discharge, a claim under the Virginia Consumer Protection Act ("VCPA") can be based upon proof of some "deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code § 59.1-200(A)(14).   A "consumer transaction" includes the "sale . . . of goods or services to be used primarily for personal, family or household purposes."  Va. Code § 59.1-198.  Accordingly, while not all violations of the Act are based on such morally blameworthy conduct as false representations or fraud, those violations which are so founded are ones which can create a legal liability which may survive a bankruptcy discharge.  Just as in the case of a § 523(a)(2)(A) objection to discharge, a plaintiff asserting a claim under the VCPA based on a claim arising as a result of false representation or fraud must prove reliance upon the false representation.  *Cooper v. GGGR Invs., LLC*, 334 B.R. 179, 188 (E.D. Va. 2005).

## DAMAGES RECOVERABLE IN VIRGINIA FOR TORT OF FRAUD

The Supreme Court of Virginia has held that a purchaser of property who has been defrauded by false representations is entitled to recover as damages the difference between the actual value of the property at the time the contract was made and the value the property would have possessed had the representation been true.  *Patel v. Anand, L.L.C.*, 564 S.E.2d 140, 143 (Va. 2002); *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999).  *See also Tyson v. Williamson*, 32 S.E. 42, 43 (Va. 1899).

### DAMAGES AND ATTORNEYS' FEES RECOVERABLE UNDER VCPA

The Virginia Consumer Protection Act expressly authorizes individual actions for losses suffered as a result of a violation of its provisions.  Treble damages may be awarded for "willful" violations.  In addition the court may award reasonable attorneys' fees and court costs. The actual statutory language providing for these remedies is set forth in § 59.1-204 (A) and (B) and provides as follows:

> A. Any person who suffers loss as the result of a violation of this chapter shall be entitled to initiate an action to recover actual damages, or $500, whichever is greater.  If the trier of fact finds that the violation was willful, it may increase damages to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater. . . .

> B. Notwithstanding any other provision of law to the contrary, in addition to any damages awarded, such person also may be awarded reasonable attorneys' fees and court costs.

### APPLICATION OF LAW TO DETERMINED FACTS

Based upon its findings of fact that the Debtor's salesman, Jeff Curtis, when asked about new paint work on the Subaru Outback which he was attempting to sell to Mr. Russ, told the latter that the vehicle had only been involved in a "fender bender;" that he either knew such statement was seriously and materially misleading or made it with a reckless disregard as to its truth or falsity; that he made it for the purpose of dissuading Mr. Russ from making further inquiries into the history of the vehicle; that Mr. and Mrs. Russ relied upon the assumed truth of this statement in deciding to purchase the vehicle; that such statement related to a matter of fact, not opinion; that it was material to their purchase decision; that had it not been made, Mr. Russ, who was familiar with CARFAX® vehicle history reports, would have required that such a report

24

be provided or would have obtained one on his own; that the Plaintiffs would not have purchased

the Subaru if they had known the vehicle's accident and salvage history; that they acquired the

vehicle for personal and family purposes rather than for any business purpose; and that they

suffered a loss as a result of the salesman's false statement; the Court concludes that they have

established a case of liability on the part of the Debtor under both Virginia's common law tort of

fraud and its statutory Consumer Protection Act and that the debt so established qualifies for the

exception from discharge contained in § 523(a)(2)(A) of the Bankruptcy Code.  The Court

concludes that the Plaintiffs' reliance upon the supposed truth of the representations made by

salesman Curtis about the accident history of the vehicle met the comparatively low standard of

"justifiable reliance" because there was nothing noticeable about the car that would have made

the falsity of such representation obvious to them, their supposition of truthfulness on the part of

Mr. Curtis being supported by the satisfactory test drive of the vehicle.

The fact that the evidence supports the conclusion that someone associated with

Absher Sales viewed a CARFAX® report on the Subaru before the unfortunate Mr. Russ

ventured onto its place of business suggests that any salesman having knowledge of the report

would have a disincentive to make that report available to any prospective purchaser and a

financial reason to deflect a potential buyer from making an inquiry into the car's history.  It

appears that the latter is exactly what the assurances given by salesman Curtis were intended to

do and in fact accomplished.  While of course neither the Court nor the parties can know for sure

what that June 2002 report would have disclosed, unless a copy of it would somehow now come

to light, no suggestion has been made that such report would not have been likely to report the

same pre-2002 information that the 2004 report disclosed.  It is apparent from the evidence that

25

Mr. Absher personally was attempting to avoid disclosing anything beyond what was absolutely required and thereby by such reticence effect a sale of the Outback while at the same time attempting to get something, specifically an acknowledgment of awareness of "paint work" on the car, which he could attempt to use as protection against liability to the purchasers if they ever realized that they had been snookered and tried to do something about it.  If his salesman had limited his sales talk to such generalities as "the car is a good car," "it runs great," "this vehicle is a very popular model" and similar common examples of everyday puffery, and had replied to an expressed interest in a CARFAX® report with something like, "well, that's up to you if you feel that you want one after driving it," Mr. Absher might have been successful in his estimation of how close he could come to the line without getting himself into trouble.  When one ventures that close to the line separating careful dealing from sharp business practices, however, he shouldn't be that surprised that sometimes he may miscalculate.

While the statement made by the Debtor's salesman was sufficient in the Court's estimation to constitute a "willful" violation of the VCPA permitting the award of treble damages, the Court has decided that such an award is not justified under the facts presented here. The factors so persuading the Court are the Plaintiffs' failure to take reasonable steps after they learned the information about their car which the 2004 CARFAX® report disclosed to minimize their damages, such as by having a competent evaluation made of the vehicle to determine what repairs might be made to assure its reliability and continued usefulness to them or to make it saleable to someone who might be looking for a "bargain" and would be willing to accept a blemished vehicle history to get one, their failure to make a clear demand upon the Debtor to rescind the transaction and negotiate an arrangement fairly recognizing the value they had

obtained by their use of the vehicle over a period of approximately eighteen months, and the

state of Virginia law which imposes a rather light disclosure obligation upon used car dealers

regarding the accident history of the vehicles which they sell to consumers.  Accordingly, the

Court will enter a non-dischargeable judgment in favor of the Plaintiffs against the Defendant in

the amount of $9,705.00 with simple interest thereon at the federal judgment rate of interest

currently in effect, from July 10, 2002, the date of their purchase of the Subaru, to the date of

payment, plus reasonable attorneys' fees and reimbursement of reasonable expenses incurred to

be determined upon a separate application once the Debtor has accepted the finality and validity

of the judgment herein awarded or all appeals or other challenges with respect to such issues

have been exhausted or otherwise finally resolved, and their taxable court costs in this

proceeding and in the state court litigation of their claim prior to the commencement of the

Debtor's bankruptcy case.  An order to such effect will be entered contemporaneously herewith.

DECIDED this 7th day of October, 2011.

William F. Stone, Jr.

UNITED STATES BANKRUPTCY JUDGE